## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

HAROLD C. RUSH,

     *Plaintiff*,

*v.*                         CASE NO. 10-CV-13153

COMMISSIONER OF             DISTRICT JUDGE AVERN COHN
SOCIAL SECURITY,          MAGISTRATE JUDGE CHARLES E. BINDER

     *Defendant*.

_____/

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION[1]

### I.    RECOMMENDATION

In light of the entire record in this case, I suggest that substantial evidence supports the Commissioner's determination that Plaintiff is not disabled. Accordingly, **IT IS RECOMMENDED** that Plaintiff's Motion for Summary Judgment be **DENIED**, that Defendant's Motion for Summary Judgment be **GRANTED**, and that the findings of the Commissioner be **AFFIRMED**.

### II.    REPORT

#### A.    Introduction and Procedural History

Pursuant to 28 U.S.C. § 636(b)(1)(B), E.D. Mich. LR 72.1(b)(3), and by Notice of Reference, this case was referred to this magistrate judge for the purpose of reviewing the Commissioner's decision denying Plaintiff's claim for a period of disability, disability insurance

---

[1] The format and style of this Report and Recommendation are intended to comply with the requirements of the E-Government Act of 2002, Pub. L. 107-347, 116 Stat. 2899 (Dec. 17, 2002), the recently amended provisions of Fed. R. Civ. P. 5.2(c)(2)(B), E.D. Mich. Administrative Order 07-AO-030, and guidance promulgated by the Administrative Office of the United States Courts found at: http://jnet.ao.dcn/img/assets/5710/dir7-108.pdf. This Report and Recommendation only addresses the matters at issue in this case and is not intended for publication in an official reporter or to serve as precedent.

benefits (DIB) and Supplemental Security Income (SSI) benefits. This matter is currently before this Court on cross-motions for summary judgment. (Docs. 13, 18, 19.)

Plaintiff was 47 years of age at the time of the most recent administrative hearing. (Transcript, Doc. 5 at 32.) Plaintiff's employment history includes working as a roofer for 26 years. (Tr. at 138.) Plaintiff filed the instant claims on March 28, 2006, and on June 19, 2006, alleging that he became unable to work on September 11, 2004, and December 21, 2004. (Tr. at 105, 108,115.) The claims were denied at the initial administrative stages. (Tr. at 62.) In denying Plaintiff's claim, the Commissioner considered chronic low back pain and affective disorders as possible bases for disability. (*Id.*) On January 16, 2009, Plaintiff appeared before Administrative Law Judge ("ALJ") Maren Dougherty, who considered the application for benefits *de novo*. (Tr. at 7-24.) In a decision dated February 4, 2009, the ALJ found that Plaintiff was not disabled. (Tr. at 24.) Plaintiff requested a review of this decision on February 9, 2009. (Tr. at 7.)

The ALJ's decision became the final decision of the Commissioner, *see Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 543-44 (6th Cir. 2004), on July 20, 2010, when, after the review of additional exhibits[2] (Tr. at 515-41,) the Appeals Council denied Plaintiff's request for review. (Tr. at 1-3.) On August 10, 2010, Plaintiff filed the instant suit seeking judicial review of the Commissioner's unfavorable decision.

**B.     Standard of Review**

---

[2]In this circuit, where the Appeals Council considers additional evidence but denies a request to review the ALJ's decision, since it has been held that the record is closed at the administrative law judge level, those "AC" exhibits submitted to the Appeals Council are not part of the record for purposes of judicial review. *See Cline v. Comm'r of Soc. Sec.*, 96 F.3d 146, 148 (6th Cir. 1996); *Cotton v. Sullivan*, 2 F.3d 692, 696 (6th Cir. 1993). Therefore, since district court review of the administrative record is limited to the ALJ's decision, which is the final decision of the Commissioner, the court can consider only that evidence presented to the ALJ. In other words, Appeals Council evidence may not be considered for the purpose of substantial evidence review.

In enacting the social security system, Congress created a two-tiered structure in which the administrative agency handles claims and the judiciary merely reviews the determination for exceeding statutory authority or for being arbitrary and capricious. *Sullivan v. Zebley*, 493 U.S. 521, 110 S. Ct. 885, 890, 107 L. Ed. 2d 967 (1990). The administrative process itself is multifaceted in that a state agency makes an initial determination which can be appealed first to the agency itself, then to an ALJ, and finally to the Appeals Council. *Bowen v. Yuckert*, 482 U.S. 137, 142, 107 S. Ct. 2287, 96 L. Ed. 2d 119 (1987). If relief is not found during the administrative review process, the claimant may file an action in federal district court. *Id.*; *Mullen v. Bowen*, 800 F.2d 535, 537 (6th Cir. 1986) (en banc).

This Court has original jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g). Judicial review under this statute is limited in that the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record." *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005). *See also Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). In deciding whether substantial evidence supports the ALJ's decision, "we do not try the case *de novo*, resolve conflicts in evidence, or decide questions of credibility." *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007). *See also Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).

"It is of course for the ALJ, and not the reviewing court, to evaluate the credibility of witnesses, including that of the claimant." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 247 (6th Cir. 2007). *See also Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 542 (6th Cir. 2007) (the "ALJ's credibility determinations about the claimant are to be given great weight, 'particularly since the ALJ is charged with observing the claimant's demeanor and credibility'") (citing *Walters*, 127 F.3d

at 531 ("Discounting credibility to a certain degree is appropriate where an ALJ finds contradictions among medical reports, claimant's testimony, and other evidence")); *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 475 (6th Cir. 2003) (an "ALJ is not required to accept a claimant's subjective complaints and may . . . consider the credibility of a claimant when making a determination of disability."). "However, the ALJ is not free to make credibility determinations based solely upon an 'intangible or intuitive notion about an individual's credibility.'" *Rogers,* 486 F.3d at 247 (quoting S.S.R. 96-7p, 1996 WL 374186, at *4).

If supported by substantial evidence, the Commissioner's findings of fact are conclusive. 42 U.S.C. § 405(g). Therefore, a court may not reverse the Commissioner's decision merely because it disagrees or because "there exists in the record substantial evidence to support a different conclusion." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006). *See also Mullen*, 800 F.2d at 545. The scope of a court's review is limited to an examination of the record only. *Bass,* 499 F.3d at 512-13; *Foster v. Halter*, 279 F.3d 348, 357 (6th Cir. 2001). Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers,* 486 F.3d at 241. *See also Jones*, 336 F.3d at 475. "The substantial evidence standard presupposes that there is a 'zone of choice' within which the Commissioner may proceed without interference from the courts." *Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994) (citations omitted) (citing *Mullen*, 800 F.2d at 545).

When reviewing the Commissioner's factual findings for substantial evidence, a reviewing court must consider the evidence in the record as a whole, including that evidence which might subtract from its weight. *Wyatt v. Sec'y of Health & Human Servs.*, 974 F.2d 680, 683 (6th Cir. 1992). "Both the court of appeals and the district court may look to any evidence in the record,

4

regardless of whether it has been cited by the Appeals Council." *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001). There is no requirement, however, that either the ALJ or the reviewing court discuss every piece of evidence in the administrative record. *Kornecky v. Comm'r of Soc. Sec.*, 167 Fed. App'x 496, 508 (6th Cir. 2006) ("[a]n ALJ can consider all the evidence without directly addressing in his written decision every piece of evidence submitted by a party"); *Van Der Maas v. Comm'r of Soc. Sec.*, 198 Fed. App'x 521, 526 (6th Cir. 2006).

## C.     Governing Law

The "[c]laimant bears the burden of proving his entitlement to benefits." *Boyes v. Sec'y of Health & Human Servs.*, 46 F.3d 510, 512 (6th Cir. 1994). *Accord Bartyzel v. Comm'r of Soc. Sec.*, 74 Fed. App'x 515, 524 (6th Cir. 2003). There are several benefits programs under the Act, including the Disability Insurance Benefits Program (DIB) of Title II, 42 U.S.C. §§ 401 *et seq.*, and the Supplemental Security Income Program (SSI) of Title XVI, 42 U.S.C. §§ 1381 *et seq*. Title II benefits are available to qualifying wage earners who become disabled prior to the expiration of their insured status; Title XVI benefits are available to poverty stricken adults and children who become disabled. F. Bloch, Federal Disability Law and Practice § 1.1 (1984). While the two programs have different eligibility requirements, "DIB and SSI are available only for those who have a 'disability.'" *Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007). "Disability" means:

> inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.

42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A) (DIB); 20 C.F.R. § 416.905(a) (SSI).

The Commissioner's regulations provide that disability is to be determined through the application of a five-step sequential analysis:

Step One:  If the claimant is currently engaged in substantial gainful activity, benefits are denied without further analysis.

Step Two:  If the claimant does not have a severe impairment or combination of impairments that "significantly limits . . . physical or mental ability to do basic work activities," benefits are denied without further analysis.

Step Three:  If the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the severe impairment meets or equals one of the impairments listed in the regulations, the claimant is conclusively presumed to be disabled regardless of age, education or work experience.

Step Four:  If the claimant is able to perform his or her past relevant work, benefits are denied without further analysis.

Step Five:  Even if the claimant is unable to perform his or her past relevant work, if other work exists in the national economy that plaintiff can perform, in view of his or her age, education, and work experience, benefits are denied.

20 C.F.R. §§ 404.1520, 416.920. *See also Heston,* 245 F.3d at 534. "If the Commissioner makes a dispositive finding at any point in the five-step process, the review terminates." *Colvin,* 475 F.3d at 730.

"Through step four, the claimant bears the burden of proving the existence and severity of limitations caused by [her] impairments and the fact that [she] is precluded from performing [her] past relevant work." *Jones*, 336 F.3d at 474 (cited with approval in *Cruse,* 502 F.3d at 540). If the analysis reaches the fifth step without a finding that the claimant is not disabled, the burden transfers to the Commissioner. *Combs v. Comm'r*, 459 F.3d 640, 643 (6th Cir. 2006). At the fifth step, the Commissioner is required to show that "other jobs in significant numbers exist in the national economy that [claimant] could perform given [his] RFC [residual functional capacity] and considering relevant vocational factors." *Rogers,* 486 F.3d at 241 (citing 20 C.F.R. §§ 416.920(a)(4)(v), (g)).

## D.     ALJ Findings

The ALJ applied the Commissioner's five-step disability analysis to Plaintiff's claim and found at step one that Plaintiff last met the insured status requirements on December 31, 2008, and had not engaged in substantial gainful activity during the period from his alleged onset date of December 21, 2004, through his date last insured of December 31, 2008. (Tr. at 13.) At step two, the ALJ found that Plaintiff's degenerative disc disease with a recurrent sprain, alcohol dependence and abuse, possible depression, fracture of the left foot on June 17, 2007, and obstructive lung disease noted in April 2008 were "severe" within the meaning of the second sequential step. (*Id.*) At step three, the ALJ found no evidence that Plaintiff's combination of impairments met or equaled one of the listings in the regulations. (Tr. at 13-14.) At step four, the ALJ found that Plaintiff could not perform any of her past relevant work. (Tr. at 23.) At step five, the ALJ found that Plaintiff could perform a limited range of sedentary work. (Tr. at 14-23.) Therefore, the ALJ found that Plaintiff was not disabled. (Tr. at 24.)

### E.    Administrative Record

A review of the relevant medical evidence contained in the administrative record indicates that Plaintiff sought treatment in the emergency room of St. John Oakland Hospital on May 30, 2004, for face, leg and back pain resulting from a fall from the porch of his home onto cement after he had blacked out. (Tr. at  318.) Plaintiff admitted that he drank a case of beer that day before falling. (Tr. at 320.) X-rays taken on May 30, 2004, of the cervical spine, right mandible, and left femur were all normal. (Tr. at 328.) In addition, a tomographic scan of Plaintiff's head showed "cortical atrophy" and "no evidence of acute hemorrhage, mass or infarction." (Tr. at 329.)

Plaintiff was injured at work on December 21, 2004, when he slipped on some ice on a roof and was caught by his harness, injuring his back and chest. (Tr. at 227, 232.) At the emergency room that day, Plaintiff's main complaint was that it "hurts when he breathes." (Tr. at 234.) A

chest x-ray taken at the time was "normal." (Tr. at 235-36.) Plaintiff underwent physical therapy but was discharged on December 30, 2004, "secondary to plateauing in therapy." (Tr. at 345.)

Plaintiff was also treated by Detroit Medical Center's Occupational Health Services for his work-related injury occurring on December 21, 2004. Initially, Plaintiff was restricted to no lifting over 50 pounds. (Tr. at 228.) On February 7, 2005, the Occupational Health Services' physician noted "[m]oderate symptom exaggeration" which was also seen by Plaintiff's physical therapist. (Tr. at 211.) On February 14, 2005, the Occupational Health Services physician noted that when he spoke with Plaintiff's employer, Plaintiff indicated that he "could not come to work because his hip was dislocated," even though that was not true. (Tr. at 239.) Plaintiff reported that day that "there is no way he can return to work" and that he "wants medications for pain and for sleep." (Tr. at 239.) On February 21, 2005, Plaintiff was "cleared for full duty" by Occupational Health Services.

An MRI of the lumbar spine taken on April 1, 2005, showed "[m]ild degenerative end-plate changes along the anterior superior end-plates of all the lumbar segment[;] [a]t L3-L4, there is shallow broad annular bulge causing no significant stenosis or nerve root impingement in the supine position[;] [a]t L4-L5, there is mild bilateral facet osteoarthropathy[;] [and t]here is no disc herniation, stenosis or nerve root impingement." (Tr. at 384.) Orthopedic surgeon Terry L. Weingarden, D.O., of the Michigan Evaluation Group, reviewed the MRI and opined that, "[b]ased on the EMG and MRI findings, I do feel that he is able to return back to his regular job at work. I would place no restrictions on him." (Tr. at 498-99.)

Plaintiff was referred by his counsel for a consultative examination with Jack Belen, M.D., on August 18, 2005, who diagnosed Plaintiff with "chronic severe lumbosacral strain" and "chronic lumbosacral radiculopathy." (Tr. at 393.) Dr. Belen stated that Plaintiff "is currently

disabled from any type of work due to the severity of his condition." (Tr. at 393.) The record also contains a transcript, dated September 22, 2005, from Plaintiff's workers' compensation case wherein Dr. Belen testified. (Tr. at 394-436.) Dr. Belen indicated that the "key physical findings that led [him] to the diagnosis" were: (1) spasm in the lumbrosacral paraspinal musculature on both sides that is an involuntary contraction of the muscles in the low back and tenderness in the lumbrosacral paraspinal musculature bilaterally; (2) significant loss of range of motion in the low back, i.e., no backward bending and only 20 degrees of forward bending where attempts to do so were extremely painful for the patient, pain caused by leg elevation, and a decrease of sensation over the L4-L5 and S1 dermatomes. (Tr. at 412-13.) In addition, Dr. Belen noted that Plaintiff walked with an abnormal gait. (Tr. at 413.) Dr. Belen also indicated that he relied on the April 5, 2005, MRI results. (Tr. at 414.) Dr. Belen did not rely on the EMG taken on April 7, 2005, which was normal, because an "H-reflex was not performed at the time of that EMG" and the ankle reflex test is a "flashing red light that leads the examiner to a diagnosis of an S1 radiculopathy or a pinched nerve of the S1 nerve root." (Tr. at 415-16.) Dr. Belen explained that:

> either or both of the abnormalities seen on the MRI can be the cause of the radiculopathy. The L3-L4 bulge that's pressing on the thecal sac may be one of the causes because, as I mentioned, the thecal sac at that level contains all of the nerve roots that are going to be going into the legs, including the S1 nerve root. And we do see that the disc that's bulging is bulging enough that it's actually pressing and impinging upon the sac of the nerves, so that could easily be one of the causes. And the other might be the fact that there is the facet osteoarthropathy, and that could possibly also be contributing to a pinching of the nerve at the L5-S1 level.

(Tr. at 415-16.) Dr. Belen testified that the only "objective positive findings" that he based his opinion on were "spasms and the absence of the left Achilles tendon reflex." (Tr. at 423-24.)

Dr. Belen confirmed that at the time of his examination in August 2005, Plaintiff was not seeing any doctor regularly nor was he taking any kind of prescription medication. (Tr. at 421-22.) Dr. Belen indicated that his examination of Plaintiff took approximately one-half hour. (Tr. at 422-

23.) Dr. Belen further testified that he would recommend Plaintiff be treated at a "formal university based pain clinic" and that his prognosis was "guarded" because he "would not expect full or total recovery." (Tr. at 413.)

On November 10, 2005, Steve Geiringer, M.D., was deposed by the defendants in Plaintiff's workers compensation case. (Tr. at 501.) Dr. Geiringer testified that he performed an EMG on Plaintiff's back and legs and concluded that

> [it] was a normal study, meaning that the first part with the electrical shocks yielded normal results. The second part with the needle pokes in the right leg, left leg, right low back, left low back, all of these were normal. The results of that means that there is no pinched nerve to the point of nerve damage wither now or in the recent past in either leg coming from the back and arising from the back going down either leg.

(Tr. at 506.)

It was noted that both Dr. Belen and Dr. Weingarden found that Plaintiff "had an absent Achilles reflex" and that Dr. Belen had criticized the EMG results of Dr. Weingarden's study because Dr. Weingarden had not performed an "H reflex" study. (Tr. at 507.) Dr. Geiringer responded that the H reflex study looks for any current or past "irritation or damage to one specific nerve root and that's S1." (Tr. at 507.) Dr. Gieringer explained that the H reflex study "is not done by the vast majority of people for lower limb type pain to look for a pinched nerve for the very simple reason that it yields no additional information besides what is normally done in a clinical examination which is tapping the ankle reflex with a hammer, so I have never done the H reflex on a routine basis, never will.  Most people I know who are considered experts in the field of EMG also do not do the H reflex for the same reason." (Tr. at 507.) When asked how he would reconcile an abnormal reflex with a normal EMG study, Dr. Gieringer stated that "[o]ne possibility, and in my experience the most common, is that somebody had an old pinched nerve . . . and back then your reflex was gone, most people will have the reflex recover so that five years alter they are

equal from side to side but a definite percent of people . . . will never get their reflex back . . . ."
(Tr. at 508.) "Another possibility is that the nerve is just irritated, meaning in this case the S1 nerve
root coming from the back is irritated but not to the point of damage . . . ." (*Id.*) Dr. Gieringer
concluded that Plaintiff has not had significant nerve damage "for at least four or five years." (Tr.
at 510.)

On December 6, 2005, Plaintiff was treated in the emergency room after he was "having
some anger issues and punched a mirror with his right fist." (Tr. at 187, 359.)

On July 18, 2006, Plaintiff was assessed by a physician with the Disability Determination
Services ("DDS") as having "major depressive disorder, 296.33." (Tr. at 259.)

A Physical Residual Functional Capacity ("RFC") Assessment completed on August 12,
2006, concluded that Plaintiff retains the ability to occasionally lift 20 pounds, frequently lift 10
pounds, stand or walk for about 6 hours in an 8-hour workday, sit for about 6 hours in an 8-hour
workday, and is unlimited in his ability to push or pull. (Tr. at 269.) The assessment also concluded
that Plaintiff is occasionally limited in his ability to climb stairs, should never climb ladders, ropes
or scaffolds, is frequently limited in his ability to balance, and is occasionally limited in his ability
to stoop, kneel, crouch, and crawl. (Tr. at 270.) There were no manipulative, visual,
communicative or environmental limitations established. (Tr. at 271-72.)

A Psychiatric Review Technique completed on August 12, 2006, diagnosed Plaintiff with
an affective disorder, i.e., depressive disorder. (Tr. at 280.) Plaintiff was found to be mildly limited
in his activities of daily functioning, moderately limited in maintaining social functioning and
moderately limited in his ability to maintain concentration, persistence, or pace. (Tr. at 287.)

A Mental RFC Assessment completed on August 12, 2006, concluded that Plaintiff was
moderately limited in the ability to understand and remember detailed instructions, the ability to

carry out detailed instructions, the ability to maintain attention and concentration for extended periods, the ability to interact appropriately with the general public, and the ability to respond appropriately to changes in the work setting. (Tr. at 292.) The assessment also concluded that Plaintiff "is able to do simple, unskilled work on a sustained basis." (Tr. at 293.)

After Plaintiff fell on March 24, 2007, a CT of the cervical spine showed "no acute fracture or subluxation[,]" "[d]egenerative changes noted at the C6-C7 level with anterior and posterior spurring[,]" and "[p]osterior bulging of the disk at the C3-C4 level . . . ." (Tr. at 445.) On that same day, a CT scan of the head showed "[g]eneralized atrophy, considered inappropriate for a patient of stated age 45[,]" and "[n]o acute hemorrhage or infarction or fracture." (Tr. at 446.) In addition, a CT scan of the lumbar spine on March 24, 2007, was "essentially unremarkable . . . some mild degenerative spurring noted anteriorly but otherwise unremarkable." (Tr. at 447.)

Plaintiff fractured his left foot on June 7, 2007, (Tr. at 367) and underwent surgery on July 2, 2007, by Dennis Kelly, D.O. (Tr. at 356-57.) Surgery was delayed because on June 17, 2007, Plaintiff "[s]howed up for surgery intoxicated." (Tr. at 355.) The screws implanted during surgery remained "in good position" during Plaintiff's follow-up office visits. (Tr. at 353-54.) On August 21, 2007, Dr. Kelly indicated that he "would like to wean him off the narcotics." (Tr. at 354.)

On January 5, 2008, Plaintiff was treated in the "emergency room by EMS secondary to a fall down a flight of stairs while intoxicated . . . ." (Tr. at 451.) A "witness indicate[d] that he fell on a beer bottle on the left side of his face and had a positive loss of consciousness for an unknown amount of time." (*Id*.) "The patient also gives a history of falling occasionally while intoxicated, he states that he walks with a cane due to previous foot and back injuries." (*Id*.) Plaintiff was treated for "[m]ultiple orbital and facial fractures, left eye; including a nondisplaced orbital fracture" and "[m]ultiple superficial eyelid lacerations." (Tr. at 462, 471, 473-74.) The lacerations

12

were repaired and Plaintiff was to be followed on an outpatient basis. (Tr. at 465-68.) A CT scan of the chest taken after this fall was normal. (Tr. at 472.) A CT scan of the cervical spine taken that day showed "[m]ild straightening of the cervical spine, degenerative or due to muscle spasm[,] [n]o cervical spine fracture[,] [m]ulti-level DDD most prominent at C6-7[,] [p]revertebral soft tissues unremarkable[,]" and "[f]acial fx, see facial CT." (Tr. at 474.)

Plaintiff also sought treatment for pain with Harold O. Dubin, D.O., from April through October of 2008. (Tr. at 476-79.) Dr. Dubin noted that Plaintiff had "been to the pain clinic with poor success." (Tr. at 477.)

On April 17, 2008, a CT of the lumbosacral spine showed only "minimal degenerative osteoarthritic changes of the lumbosacral spine." (Tr. at 483.) Plaintiff underwent "[t]ranslumbar epidural injection [] with local anesthetic and corticosteroid" on April 28, June 2, and July 14 of 2008. (Tr. at 488, 491, 494.)

A letter authored by Dr. Dubin dated September 30, 2008, and written to "whom it may concern," stated that Plaintiff "is not doing well at all . . . ." (Tr. at 496.) He "has severe lumbosacral sprain with instability and ruptured disc and radiculopathy and severe arthritis." (*Id.*) "The patient's condition is extremely poor." (*Id.*) Dr. Dubin noted that Plaintiff "has chronic pain syndrome" and concluded that his "prognosis for the future is guarded." (Tr. at 496.)

Plaintiff indicated in his Adult Function Report that he does not use a cane or any other device to aid in ambulation. (Tr. at 155.)

### F.    Analysis and Conclusions

### 1.    Legal Standards

The ALJ determined that during the time he qualified for benefits, Plaintiff possessed the residual functional capacity to perform a limited range of sedentary work. (Tr. at 14-23.) Sedentary

work involves lifting no more than ten pounds at a time and occasionally lifting and carrying articles like docket files, ledgers and small tools. Although a sedentary job is defined as one that involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met. 20 C.F.R. § 404.1567(a)(1991). Social Security Ruling 83-10 clarifies this definition:

> "Occasionally" means occurring from very little up to one-third of the time. Since being on one's feet is required "occasionally" at the sedentary level of exertion, periods of standing or walking should generally total no more than about 2 hours of an 8-hour workday, and sitting should generally total approximately 6 hours of an 8-hour workday. Work processes in specific jobs will dictate how often and how long a person will need to be on his or her feet to obtain or return small articles.

SSR 83-10.

After review of the record, I suggest that the ALJ utilized the proper legal standard in his application of the Commissioner's five-step disability analysis to Plaintiff's claim. I turn next to the consideration of whether substantial evidence supports the ALJ's decision.

### 2.   Substantial Evidence

Plaintiff contends that substantial evidence fails to support the findings of the Commissioner. (Doc. 13.) As noted earlier, if the Commissioner's decision is supported by substantial evidence, the decision must be affirmed even if this Court would have decided the matter differently and even where substantial evidence supports the opposite conclusion. *McClanahan,* 474 F.3d at 833; *Mullen,* 800 F.2d at 545. In other words, where substantial evidence supports the ALJ's decision, it must be upheld.

Plaintiff specifically contends that the ALJ erred in failing to properly apply Listing 1.04A to Plaintiff's claim based on inadequate review of the record. (Doc. 13 at 8-10.) Plaintiff complains that the ALJ's single sentence finding was insufficient. (*Id*. at 8-9.) The ALJ found that Plaintiff's

14

"back impairment fails to either meet or medically equal the requirements of listing 1.04, insofar as the record contains no evidence o[f] nerve root impingement or spinal cord compromise." (Tr. at 13.) Plaintiff contends that this "is not an adequate review of the evidence," that the ALJ inaccurately assessed the results of an MRI taken on April 1, 2005, which showed a "shallow broad annular bulge minimally indenting the ventral thecal sac," (citing Tr. at 383), and that since Dr. Belen explained that the thecal sac contains all the nerves that run into the leg (citing Tr. at 414, 416), Plaintiff contends that the "spinal cord was compressed by this bulge." (Doc. 13 at 9.)

Listing 1.04A applies to disorders of the spine and requires "[e]vidence of nerve root decompression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight leg-raising test (sitting and supine)." 20 C.F.R. Part 404, Subpart P, App'x 1, Listing 1.04A. A plaintiff's impairment must match all the specified medical criteria in order to show the impairment meets a Listing. *Sullivan v. Zebley*, 493 U.S. 521, 530, 110 S. Ct. 885, 107 L. Ed. 2d  967 (1990); 20 C.F.R. § 404.1525(c); *Golay v. Comm'r of Social Security*, 348 F.3d 124, 125 (6th Cir. 2003). Plaintiff cannot rely on the "overall functional impact of his unlisted impairment or combination of impairments" to satisfy equivalence to a Listing. *Zebley*, 493 U.S. at 531. Where the record lacks medical evidence supporting limitation in the range of motion and loss of motor reflex, the Listing is not met. *Lawson v. Comm'r,* 192 Fed App'x 521, 529 (6th Cir. 2006).

Plaintiff contends that his absent Achilles reflex in his left foot satisfies Listing 1.04A by showing "nerve root decompression," as supported by Dr. Belen's testimony and the MRI of April 2005. (Doc. 13 at 9-11.)

I suggest that substantial evidence supports the ALJ's findings that Plaintiff did not meet Listing 1.04's requirements of "nerve root decompression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness)." 20 C.F.R. Part 404, Subpart P, App'x 1, Listing 1.04A. Plaintiff bases his criticism of the ALJ on the results of an MRI taken in April 2005. The MRI showed a "shallow broad annular bulge" at L3-L4; however, that abnormality was found to be "causing no significant stenosis or nerve root impingement." (Tr. at 384.) In addition, at L4-L5, although "mild bilateral facet osteoarthropathy" was seen, the MRI also concluded that there was "no disc herniation, stenosis or nerve root impingement." (Tr. at 384.) A CT scan of the lumbar spine taken in March 2007 showed "some mild degenerative spurring," "but otherwise [was] unremarkable." (Tr. at 447.) Again, on April 17, 2008, a CT scan of the lumbosacral spine showed only "minimal degenerative osteoarthritic changes of the lumbosacral spine." (Tr. at 483.) I therefore suggest that the ALJ's finding of no nerve root decompression is supported by substantial evidence and that the failure to meet this requirement of the Listing provides sufficient basis to affirm the ALJ's decision by itself.

Even assuming, *arguendo,* that the nerve root decompression requirements of the Listing could be met, I suggest that substantial evidence supports the ALJ's finding that any nerve root decompression was not accompanied by "sensory or reflex loss and, since there was involvement of the lower back, positive straight leg-raising test (sitting and supine)." 20 C.F.R. Part 404, Subpart P, Appendix 1, Listing 1.04A. Dr. Belen's examination provides some evidence of positive straight leg-raising where he testified that straight leg raising "on the right side caused low back pain with right leg elevation to 45 degrees, and on the left side it was more significantly abnormal, being only 30 degrees of leg elevation resulting in a complaint of severe low back pain." (Tr. at

413.) The ALJ gave "consideration" to Dr. Belen's opinion, but did not adopt it because Dr. Belen only saw Plaintiff for approximately 30 minutes and because, "except for the spasms and absence of left ankle reflex, all other findings . . . were subjective and within the claimant's control . . . [and] the claimant underwent the examination by Dr. Belen not in an attempt to seek treatment but rather in an effort to generate evidence in support of his workers' compensation claim." (Tr. at 21-22.) Dr. Belen's testimony is unclear whether positive reports were achieved in both the supine and sitting positions as required by the Listing. In addition, as the ALJ noted, the positive test results are wholly dependent on the subjective reports of Plaintiff. Since Plaintiff's credibility was questioned by others, I suggest the ALJ's decision to discount the reliability of test results that rested solely on Plaintiff's subjective complaints was supported by substantial evidence. (Tr. at 211, 239) (Occupational Health Services' physician and physical therapist noted "[m]oderate symptom exaggeration" and, when the doctor spoke with Plaintiff's employer, he learned that Plaintiff had lied and told his employer that he "could not come to work because his hip was dislocated.")

As to sensory or reflex loss, Dr. Belen's opinion is again the source of support for Plaintiff's argument that the Listing was met. Dr. Belen and Dr. Gieringer are examining sources; whereas, Dr. Weingarden interpreted the April 2005 MRI without examining Plaintiff. Therefore, the opinions of Dr. Belen and Dr. Gieringer are entitled to equal weight, and the weight accorded their opinions is slightly higher than that of Dr. Weingarden. 20 C.F.R. § 404.1527(d)(1)-(2).

Dr. Weingarden reviewed the April 2005 MRI and opined that, "[b]ased on the EMG and MRI findings, I do feel that he is able to return back to his regular job at work. I would place no restrictions on him." (Tr. at 498-99.) On the other hand, Dr. Belen stated that Plaintiff "is currently

disabled from any type of work due to the severity of his condition." (Tr. at 393.) Dr. Geiringer performed an EMG on Plaintiff's back and legs in April 2005 and concluded:

> [It] was a normal study, meaning that the first part with the electrical shocks yielded normal results. The second part with the needle pokes in the right leg, left leg, right low back, left low back, all of these were normal. The results of that means that there is no pinched nerve to the point of nerve damage wither now or in the recent past in either leg coming from the back and arising from the back going down either leg.

(Tr. at 506.)

Dr. Belen indicated that he did not rely on the above normal EMG study because an "H-reflex was not performed at the time of that EMG" and that ankle reflex test is a "flashing red light that leads the examiner to a diagnosis of an S1 radiculopathy or a pinched nerve of the S1 nerve root." (Tr. at 415-16.) Dr. Belen relied on the fact that the thecal sac contains nerve roots and that any disc bulge near the sac "could" pinch the nerves. (Tr. at 415-16.) Dr. Belen testified that the only "objective positive findings" that he based his opinion on were "spasms and the absence of the left Achilles tendon reflex." (Tr. at 423-24.)

Dr. Gieringer was privy to all the above information and noted that both Dr. Belen and Dr. Weingarden found that Plaintiff "had an absent Achilles reflex" and that Dr. Belen had criticized the EMG results of Dr. Weingarden's study because Dr. Weingarden had not performed an "H reflex" study. (Tr. at 507.) Dr. Gieringer explained that the H reflex study "is not done by the vast majority of people for lower limb type pain to look for a pinched nerve for the very simple reason that it yields no additional information besides what is normally done in a clinical examination which is tapping the ankle reflex with a hammer" and that "[m]ost people I know who are considered experts in the field of EMG also do not do the H reflex for the same reason." (Tr. at 507.) When asked how he would reconcile an abnormal reflex with a normal EMG study, Dr. Gieringer stated that either a person "had an old pinched nerve" or "S1 nerve root coming from

18

the back is irritated but not to the point of damage . . . ." (Tr. at 508.) Dr. Gieringer concluded that

Plaintiff had not had significant nerve damage "for at least four or five years." (Tr. at 510.)

I suggest that the ALJ's decision to accord more weight to the EMG study and Dr.

Gieringer's explanation of Dr. Weingarden's EMG study results rather than Dr. Belen is supported

by substantial evidence. It is of no consequence, under the substantial evidence test, that substantial

evidence may also have supported the opposite conclusion to credit Dr. Belen's testimony over Dr.

Weingarden and Dr. Gieringer's testimony. *McClanahan; Mullen*. I suggest that since "credible

evidentiary choices or medical findings [] exist to support the decision of the ALJ that the claimant

does not satisfy Listing 1.04," the decision of the ALJ should be affirmed. *See Ferrari v. Astrue*,

No. 08-0719, 2009 WL 3010817, at *4 (W.D. La. Sept. 21, 2009).

### 3.    Conclusion

For all these reasons, after review of the record, I conclude that the decision of the ALJ,

which ultimately became the final decision of the Commissioner, is within that "zone of choice

within which decisionmakers may go either way without interference from the courts," *Felisky*,

35 F.3d at 1035, as the decision is supported by substantial evidence.

## III.   **REVIEW**

The parties to this action may object to and seek review of this Report and Recommendation

within fourteen (14) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1).

Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v.*

*Arn*, 474 U.S. 140, 106 S. Ct. 466, 88 L. Ed.2d 435 (1985); *Frontier Ins. Co. v. Blaty*, 454 F.3d

590, 596 (6th Cir. 2006); *United States v. Sullivan,* 431 F.3d 976, 984 (6th Cir. 2005).  The parties

are advised that making some objections, but failing to raise others, will not preserve all the

objections a party may have to this Report and Recommendation. *McClanahan*, 474 F.3d at 837; *Frontier Ins. Co.,* 454 F.3d at 596-97. Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this Magistrate Judge.

Within fourteen (14) days of service of any objecting party's timely filed objections, the opposing party may file a response. The response shall be concise, but commensurate in detail with the objections, and shall address specifically, and in the same order raised, each issue contained within the objections.

s/ 𝕮harles 𝕰 𝕭inder

CHARLES E. BINDER
Dated: June 2, 2011                    United States Magistrate Judge


**CERTIFICATION**

I hereby certify that this Report and Recommendation was electronically filed this date and served upon counsel of record via the Court's ECF System.

Date:  June 2, 2011                    By     s/Patricia T. Morris
                                           Law Clerk to Magistrate Judge Binder